# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2009-KA-01090-SCT

*JOHN T. GORE*

*v.*

*STATE OF MISSISSIPPI*

DATE OF JUDGMENT:               07/01/2009
TRIAL JUDGE:                    HON. WILLIAM E. CHAPMAN, III
COURT FROM WHICH APPEALED:      RANKIN COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:        OFFICE OF INDIGENT APPEALS
                                BY: GEORGE T. HOLMES
                                    LESLIE S. LEE
ATTORNEY FOR APPELLEE:          OFFICE OF THE ATTORNEY GENERAL
                                BY: LADONNA C. HOLLAND
DISTRICT ATTORNEY:              MICHAEL GUEST
NATURE OF THE CASE:             CRIMINAL - FELONY
DISPOSITION:                    AFFIRMED - 07/01/2010
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     John T. Gore was indicted for "gratifying his lust or indulging his depraved licentious sexual desires," on May 11, 2007, by "intentionally handl[ing], touch[ing] or rub[bing] with his hands or any part of his body or any member thereof," his twenty-one-month-old granddaughter, M.G.[1]  From his subsequent conviction and sentence in the Circuit Court of Rankin County, Mississippi, Gore appeals regarding evidentiary rulings of the circuit court and the sufficiency of the evidence.

---

[1]Miss. Code Ann. § 97-5-23(1) (Rev. 2006).

# FACTS

¶2.  Just weeks prior to the May 11, 2007, occurrence, Thomas Daniel Gore ("Daniel"), Defendant Gore's son and M.G.'s father, testified that his family had visited Defendant Gore's home.[2]  According to Daniel, Defendant Gore was "heavily intoxicated."  Daniel testified that his daughter, M.G., had fallen asleep on defendant Gore's bed.  At some point, Defendant Gore left the room where the family was socializing and was gone for several minutes.  Daniel went to look for him and found Defendant Gore in the bedroom, "with his pants down to his ankles and spooning [M.G.], it was like behind [M.G.], on her . . . with his pants around his ankles . . . ."  M.G. had no shirt or pants on.  According to Daniel:

> I really didn't think . . . much of it at the time other than he was just belligerently wasted, maybe crawled in the bed and his pants fell off.  So it kind of gave me a . . . fatherly feeling . . . that something could have been wrong with that, and it just didn't occur to me at the time that it had anything to do with such a thing.

¶3.  On the morning of May 11, 2007, Lindsey Bohn,[3] accompanied by M.G.[4] and a family friend, Matt, left to attend a music festival at which Daniel was setting up lighting and stage equipment.  En route, Bohn stopped at Defendant Gore's home between 10:30 a.m. and noon, and asked if he would like to accompany them.  Gore declined, but insisted on babysitting

---

[2]Daniel, his wife, Lindsey Bohn, and their daughter, M.G., had moved to Mississippi in December 2006.  Their home was one quarter-mile away from Defendant Gore's home, which the family visited regularly.

[3]At the time of trial, Bohn was pregnant with her second child.  The family moved back to Colorado in June 2007.

[4]M.G.'s birthday was August 3, 2005.  On May 11, 2007, she was twenty-one months old and weighed approximately twenty-five pounds.

M.G. Bohn agreed. According to Bohn, Gore had a drawer full of diapers, wipes, and clothing for M.G. at his home.

¶4.    When Bohn returned to Defendant Gore's home between 10:00 and 10:30 p.m., she discovered M.G. "laying on the bed next to [Gore], . . . completely naked, no diaper, no nothing." According to Bohn, the:

> first words out of [Gore's] mouth to me were, she found my vibrator.[5] And I, kind of shocked me a little bit, so I said, and? Well, she knows how to turn it on. And I also said, and? Well, she put it on herself.[6] And so I grabbed up [M.G.], and I'm holding her. And she wakes up, and she wants to get down, I sat her down. And [Defendant Gore], by this time, is sitting in his bathroom. . . . And [M.G.] grabs up a . . . yellow tin, and it's called Burt's Bees. It's kind of a hand soft, lotion thing. And she tells me, Papa, owee's butt, pats her behind. And at that point, I got a little leery, so I grabbed up her stuff, and me and [Matt], we went back to my house with [M.G.].

¶5.    While getting M.G. ready for bed, Bohn:

> pick[ed] up her bottom to put a diaper on her, and can see down into [M.G.'s] anus. It was the size of a nickel. . . . I lost it. . . . I just screamed, oh my God, what happened to my baby. I called in [Matt] to see if he thought it looked funny to him. He screamed, too.

Bohn told Matt, "I'm going [to] kill [Defendant Gore]. He hurt my baby." Bohn grabbed a shotgun and a "four-ten," but neither were loaded, so she took a "combat knife," left M.G. with Matt, and returned to Defendant Gore's home to confront him. Upon seeing Defendant Gore, Bohn "tried to stab him, but he got away . . . ." Then, while screaming "what happened to my baby, what's wrong with her." Without any mention that M.G.'s anus was

---

[5]At trial, the object was referred to at various points as a vibrator, a dildo, a "magic wand," and a back massager.

[6]Bohn added that Defendant Gore also told her "that we had a bath, and we were just laying down[,]" despite the fact that Bohn had not asked him to bathe M.G.

3

enlarged, "the words out of [Defendant Gore's] mouth are, maybe she did it to herself or maybe she's got to poop."[7] Bohn then "got the knife to his throat, telling him, you better call the police or you're going to die tonight. You're going to die, call the police right now. He wouldn't call them, . . . so I sat the knife down and grabbed the phone and called 911 myself." Bohn told the 911 dispatcher, "get down here quick because I'm going to kill an old man right now, he molested my baby." As the police were slow to arrive, Bohn "kind of clicked back, . . . I need to get back to my baby." When Bohn arrived back home, Matt informed her that he had also called the police. As the police had still not yet arrived, she called them a third time.

¶6.    Deputy Joseph Head of the Rankin County Sheriff's Department was dispatched to Bohn's home. According to Deputy Head, he entered Bohn's residence and, without any provocation, M.G. "was running down the hallway to the den where the couch was, and was saying the words, butt butt, and was pointing at her rear-end area." Deputy Head testified that he then briefly examined M.G.'s anus and found that it was red, but not in a rash-like sense.

¶7.    Bohn took M.G. to the emergency room at St. Dominic's Hospital, where she was examined by Dr. Dan Williams. Dr. Williams recalled "getting a frantic mom coming in . . . who . . . reported that she was very suspicious that her child had been molested . . . ." Dr. Williams stated that M.G. was initially upset and crying. Upon examination, Dr. Williams testified that M.G.'s "anus was enlarged and appeared dilated. And considering that the child

---

[7]According to Bohn, M.G. had no bowel movement or constipation problems, as "she hadn't had no diarrhea, no hard stool, none of that."

was in the bed with someone, and the mother had stated that . . . the father-in-law said that the child knew how to use the dildo, [it] raised a lot of suspicion . . . ." Dr. Williams concluded his testimony by stating that, in his expert opinion, M.G. had been sexually abused.

¶8. In the early morning hours of May 12, 2007, Deputy Head and Sheila Tucker, a juvenile investigator with the Rankin County Sheriff's Department, arrived at Defendant Gore's home. According to Investigator Tucker, Gore was "intoxicated, dirty, unkept, a little slouchy looking." On his front porch, Gore was informed of his *Miranda* rights.[8] Gore first offered that he had run out of diapers for M.G., and her clothes had been dirty, so he had put her down for a nap naked. Gore stated that he then had fallen asleep next to her. When he awoke, Gore claimed he had found M.G. playing with a white vibrator that he kept in a wooden box underneath his bed.[9] Both officers testified that Gore told them M.G. was rubbing the vibrator on her private parts. According to Deputy Head, Gore then offered to retrieve the vibrator. After leading the officers into his bedroom, according to Deputy Head, Gore "tried to get it." At that point, Deputy Head "said, show me, because I was worried [there] may be a gun in the house, . . . and . . . we pulled the box out from under the bed." Later that afternoon, Gore was arrested.

---

[8]*See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Gore had completed three years of college. Moreover, according to Investigator Tucker, Gore stated that "[h]e used to be a detective at Ridgeland Police Department, and he also worked part time at Pelahatchie Police Department as a police officer[,]" and "said he understood his rights and he would tell us what happened." Investigator Tucker had worked with Gore at the Pelahatchie Police Department.

[9]Both officers noted that the vibrator was inaccessible unless the wooden box was pulled out from under the bed and removed therefrom.

¶9.    Investigator Tucker interviewed Defendant Gore on the afternoon of May 12, 2007,[10] and again on June 1, 2007.  According to Investigator Tucker, over the course of these interviews, as well as Gore's statement in the early morning hours of May 12, 2007, Gore offered "several" inconsistent explanations for the toddler's condition.  Investigator Tucker testified that Gore:

> told me the night that we went and talked to him to start with, that the child got the vibrator.  Then, when I interviewed him, he told me that he had changed the diapers so many times, he ran out of diapers.  And he also said that he laid her down for a nap after he had given her [a] couple of baths.  He turned around and said that the baby laid down with the diaper on, which he had already told me he ran out of diapers before, that the baby had gotten in the tub, and the last diaper had gotten wet, so he laid her in the bed naked, laid her down for a nap.  He went in to . . . wash clothes, because all of her clothes were dirty.  Then he turns around and says that he laid down with her in the bed until she got to sleep.  Then he changed his story, and he said that he heard her running around in the bedroom.  And I questioned him each time on all these different statements of what he was telling me. . . . Then he turns around and says he laid down with her, he went to sleep, he heard a noise.  Well, first he said before he heard that noise that she had gotten down on th[e] floor by the bookcase, then he said he heard a noise.  He heard her make a noise down there, he looked, and she had the vibrator out from under the bed and was massaging her vagina area, private parts, . . . and he demonstrated between the legs.

Investigator Tucker added that in her extensive experience in juvenile investigations, she had never encountered a case in which a twenty-one-month-old child was using a vibrator.[11]

¶10.    At trial, Gore denied the "spooning" occurrence weeks prior to May 11, 2007. As to the May 11, 2007, occurrence, Gore stated that M.G. had run out of diapers and he was

[10]According to Investigator Tucker, Gore "was intoxicated at that time also."

[11]By contrast, according to Investigator Tucker, Gore told her that in his law-enforcement career he had handled "lots or several" cases in which a twenty-one-month-old child knew how to use a vibrator.

washing her dress, so he had placed her in his bed naked and then went "back to finish the clothes and some more stuff . . . ." When he subsequently "heard some racket[,]" Gore testified that he entered his bedroom and found that M.G. had the vibrator. According to Gore, he "never actually saw her put it on her private parts."

¶11. Gore was found guilty as charged, then sentenced to fifteen years in the custody of the MDOC, with the final two years suspended, and five years of post-release, supervised probation. Following the circuit court's denial of his "Motion for a Judgment Notwithstanding the Verdict, or in the alternative, a New Trial," Gore filed notice of appeal.

**ISSUES**

¶12. This Court will consider:

(1) Whether the circuit court abused its discretion by allowing the State to introduce evidence of prior alleged misconduct under the exceptions of Mississippi Rule of Evidence 404(b).
(2) Whether the circuit court abused its discretion by excluding the testimony of defense witness Linda Stanley under Mississippi Rule of Evidence 608(b).
(3) Whether the warrantless seizure of evidence from Gore's home was illegal.
(4) Whether the evidence was sufficient to support the jury verdict.[12]

---

[12]In Gore's brief, he states this issue as, "[w]hether the verdict is contrary to the weight of the evidence." But the only argument contained in his brief on this issue pertains to the sufficiency of the evidence. Accordingly, this Court will consider only the sufficiency of the evidence presented.

## ANALYSIS

**I. Whether the circuit court abused its discretion by allowing the State to introduce evidence of prior alleged misconduct under the exceptions of Mississippi Rule of Evidence 404(b).**

¶13.    "A trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence. Unless the judge abuses this discretion so as to be prejudicial to the accused, the Court will not reverse this ruling." *Price v. State*, 898 So. 2d 641, 653 (Miss. 2005) (quoting *Walker v. State*, 878 So. 2d 913, 915 (Miss. 2004)).

¶14.    The State sought to introduce testimony from Defendant Gore's adult children, Mary Katlin Jenkins ("Katie") and Daniel, that Defendant Gore had sexually molested Katie in his bed and had made her sit on his lap while both were naked to look at child pornography on his computer when she was twelve years old; had required both children to be naked at home, as he often was, in their juvenile years; and had required them to remain disrobed at a nudist colony. Gore denied ever improperly touching Katie, lying naked in bed with her, or requiring his children to be naked. He objected to the introduction of all such evidence. The circuit court determined this to be relevant evidence, "permissible under Rule 404(b),"[13] and concluded "that under the balancing test of [Rule] 403, the probative value is not substantially outweighed by the prejudicial effect." The circuit court also provided the following limiting instruction to the jury:

---

[13]At the sentencing hearing, the circuit judge added:

I think at times, I have questioned the admitting of 404(b) evidence in a case, but I think this is a very good example of the reason 404(b) exists. The testimony of the other victim . . . was right on point in terms of proving motivation and plan and all of those other things.

8

[t]he [c]ourt instructs the jury that acts testified to by [Daniel] and [Katie] are acts relating to charges for which the defendant is not presently on trial and are to be considered only for the limited purpose of showing proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. You cannot and must not simply infer that the defendant acted in conformity with his previous acts and that he is therefore guilty of the charge for which he is presently on trial.

¶15.    As to other wrongs or acts of sexual abuse, Katie testified that when she was twelve years old,[14] Defendant Gore "touched me, and he made me sit in his lap while he was naked and I was naked, and look at pictures on the computer of naked children." Katie stated that on another occasion, she was lying in bed, taking a nap with Defendant Gore and his then-girlfriend, Linda Stanley, and:

> we were all naked, . . . she was asleep. . . . He had his arm around me, and he reached his hand down there, and he kept touching me. And when I would pull away, he would pull me back. . . . [H]e inserted his finger into me at that moment.

On direct examination, Gore related the same event and claimed that he was "not actually arrested" for unlawful touching or sexual battery of Katie. According to Gore:

> I had voluntarily gone up and spoke to a juvenile officer, and he said I'll call you back in a couple of weeks, and he said come on up and turn yourself in. But I never saw a warrant or anything, but they booked me in, and I had to post like a [$26,000] bond. That's the last I heard of it.

But it was developed that Gore had entered into an agreement with his ex-wife that "if I would pay X number of dollars and relinquish my parental rights, they would not pursue the case." Gore was under a no-contact order with Katie, and she never saw Gore again until the age of eighteen. At the age of eighteen, Katie briefly reconnected with Gore, seeing him on

---

[14]Circa 2000; Katie was born in the fall of 1987.

9

three occasions over the course of three months. However, when Katie learned that she was pregnant with a daughter, she "didn't want [Defendant Gore] around [the daughter] . . . ."

¶16. Regarding nudity, Daniel testified that Defendant Gore "kind of tried to get me into it with him, and I was never comfortable with it." According to Daniel, "we would show up clothed . . . and it just seemed like when [Defendant Gore] wanted to flip onto this mode of naturist, we had to go with him, we had to be naked, too, with him." At Defendant Gore's home, Daniel recalled two or three occasions where he and Katie were required to take their clothes off. According to Daniel, when he grew older and refused, Defendant Gore "would get upset . . . ." Katie testified likewise, stating that:

> [i]f we ever had said that we wanted to wear our clothes, . . . we got in trouble for it. We were reprimanded. We were beaten. Well, I was, [Daniel] was never hurt. . . . But we did get in trouble for it. We were yelled at, and we were hit. It wasn't acceptable.

Daniel testified further that when attending a nudist camp in Louisiana, the children "pretty much had to follow suit and do like everybody else, whether we wanted to or not." He added that "every time we were at a camp, we had to be naked. This is like it was not an option, we had to be naked."

¶17. Gore's argument centers around Mississippi Rule of Evidence 403, contending that "the nudist colony evidence and evidence about the allegations involving Katie were remote, irrelevant, and more prejudicial than probative." Gore acknowledges that this Court, "approved of . . . prior incident evidence and took the opportunity to expand the exception to M.R.E. 404(b) for such evidence in child sexual assault cases" in ***Derouen v. State***, 994 So. 2d 748 (Miss. 2008). There, in the interest of protecting "the most innocent and

10

defenseless in society – our young children[,]" we "unequivocally overrule[d] and burie[d] *Mitchell* and its progeny, including *Lambert*, as these cases relate to the per se exclusion of evidence other than the one charged, which involves a victim other than the victim of the charged offense for which the accused is on trial." *Id*. at 756 (citing *Mitchell v. State*, 539 So. 2d 1366 (Miss. 1989) and *Lambert v. State*, 724 So. 2d 392 (Miss. 1998)). Under *Derouen*, "evidence of a sexual offense, other than the one charged, which involves a victim other than the victim of the charged offense for which the accused is on trial[,]" must be "properly admitted under Rule 404(b),[15] filtered through Rule 403, and accompanied by an appropriately-drafted limiting or cautionary instruction to the jury . . . ." *Id*.

¶18.    In *Derouen*, this Court quoted extensively from the dissenting opinion in *Lambert*, which reasoned that:

> [s]ex crimes against children are furtive, secret events usually lacking evidence other than the conflicting testimony of the defendant and the victim. The only viable proof of motive, intent, plan, knowledge, identity or absence of mistake or accident may be the pattern of abuse suffered by others at the hands of the defendant.
>
> . . .

---

[15]Mississippi Rule of Evidence 404(b) provides that:

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Miss. R. Evid. 404(b). The Comment to Rule 404 adds that "the exceptions listed in [s]ubsection (b) are not exclusive." Miss. R. Evid. 404 cmt.

11

The Louisiana . . . [c]ourt, when faced with the testimony of various neighbors and friends that the defendant had sexually assaulted them, held in a similar case:

. . .

> If admitted, this evidence will be relevant to show, contrary to the defendant's attempted exculpatory statement, that the facts giving rise to the instant charges were neither unintended nor accidental. Defendant's motive would also be disclosed: a seemingly uncontrollable desire to partake in pedophilic sexual activities with young and developing female juveniles. Finally, defendant's means of accomplishing these activities on past occasions bear substantial resemblance to each other and with the present offense.

*State v. Driggers*, 554 So. 2d 720, 726 (La. Ct. App. 1989).

. . .

In *Ex parte Register*, 680 So. 2d 225 (Ala. 1994), the Alabama Supreme Court found no abuse of discretion by the trial court in allowing the defendant's natural daughter to testify to the defendant's previous improper conduct when defendant was charged with abuse of his step-daughter. In *Shapiro v. State*, 696 So. 2d 1321 (Fla. Dist. Ct. App. 1997), the Florida court found no abuse of discretion when a former patient testified to improper conduct by a psychologist and the psychologist was charged with sexual misconduct against another patient.[16]

. . .

*Mitchell* undermines the balancing process contemplated by M.R.E. 403 and conflicts with M.R.E. 404(b) by imposing a virtual ban on evidence other than that of the relationship between the victim and the accused.

*Derouen*, 994 So. 2d at 754-55 (quoting *Lambert*, 724 So. 2d at 395-96 (Mills, J., dissenting, joined by Roberts and Smith, JJ.)). Under one or more of the exceptions listed in Rule

---

[16]*See also **Elliott v. State**, 600 P.2d 1044, 1047 (Wyo. 1979) (providing an extensive list of courts that "have sustained the admissibility of the testimony of third persons as to prior or subsequent similar crimes, wrongs or acts in cases involving sexual offenses.").

404(b), the circuit court did not abuse its discretion in admitting evidence of Gore's prior sexual abuse of his daughter, as well as acts of nudity involving his children and granddaughter.

¶19.   At trial, Gore acknowledged as much, by declaring that his "Motion In Limine" was moot, arguing only that some of the events were too remote in time, and their admission into evidence was substantially more prejudicial than probative.  In *Driggers*, the Louisiana court permitted admission of other incidents which had occurred "from seven to [twenty-six] years before the instant charges were brought."  *Driggers*, 554 So. 2d at 727.  *See also State v. Jackson*, 625 So. 2d 146, 151 (La. 1993) (involving a twenty-four-year time lapse between the other-crimes evidence and the instant offense, the Louisiana Supreme Court held that "[w]hile there must be some connexity [sic] between the crime charged and the other acts or crimes, the mere passage of time will not necessarily defeat admissibility."); *United States v. Hadley*, 918 F. 2d 848, 850-51 (9th Cir. 1990) (evidence of offenses occurring up to fifteen years earlier admitted); *State v. Plymate*, 345 N.W.2d 327 (Neb. 1984) (evidence of defendant's commission of other child molestations more than twenty years earlier admitted). The *Driggers* court astutely reasoned that, "[e]ven though the other crimes evidence may appear to be remote in time in some instances, the *incidents are all within the same time period in terms of the victims' lives because all of the victims were essentially pre-pubescent . . . ." Driggers*, 554 So. 2d at 727 (emphasis added).  Similarly, in *Ex parte Register*, the Alabama Supreme Court concluded that the lower court "did not abuse its discretion by allowing the jury to hear testimony of alleged acts of sexual misconduct committed seven to

13

nine years before the time of the offenses alleged in this case."[17] *Ex parte Register*, 680 So. 2d at 228. According to that court, "[w]here the competency of evidence is doubtful because of remoteness, *the better practice is to admit the evidence, leaving it to the jury to determine its credibility and weight . . . .*" *Id*. (quoting *Cofer v. State*, 440 So. 2d 1116, 1118-19 (Ala. Crim. App. 1983), *rev'd in part on other grounds*, 440 So. 2d 1121 (Ala. 1983)) (emphasis added). *See also Shapiro v. State*, 696 So. 2d 1321, 1324 (Fla. App. 4 Dist. 1997) (finding no abuse of discretion in lower court's admission of prior-act testimony involving another individual from twenty years earlier); *State v. Wermerskirchen*, 497 N.W.2d 235, 243 n.3 (Minn. 1993) ("[w]e have never held that there must be a close temporal relationship between the charged offense and the other crime").

¶20.   Our holding today reaffirms our holding in *Derouen*, which limits the use of such evidence by exception(s) to the rule. As to relevance and probative value, Gore's prior sexual abuse of his daughter tends to demonstrate "pedophilic sexual activities with young and developing female juveniles. . . . [The defendant's] means of accomplishing these activities on past occasions bear substantial resemblance to each other and with the present offens[e]." *Driggers*, 554 So. 2d at 726. With respect to the nudity evidence, Gore contends that "it did not involve any claim of sexual misconduct." Contrastingly, his children swore that Gore threatened and physically struck his daughter for failure to comply with his demand she be naked. We conclude that the circuit court did not abuse its discretion in admitting such evidence. Nor does it follow that the circuit court *abused its discretion* in ruling that

---

[17]In this case, seven years elapsed between the sexual abuse of Katie and the May 11, 2007, occurrence.

the probative value of such evidence is not "substantially outweighed by the prejudicial effect." *See* Miss. R. Evid. 403.

¶21.   We find no abuse of discretion by the circuit court in admitting the evidence under the exceptions of Rule 404(b), and further finding its probative value was not "substantially outweighed" by its prejudicial effect.  The circuit court further followed the mandate in *Derouen* that the jury be provided with a limiting instruction.[18]  *See Derouen*, 994 So. 2d at 756.  Therefore, this issue is without merit.

**II.   Whether the circuit court abused its discretion by excluding the testimony of defense witness Linda Stanley under Mississippi Rule of Evidence 608(b).**

¶22.   In attempting to rebut Katie's testimony, Gore sought to call his former girlfriend, Stanley, to testify that she, Gore, and Katie were always clothed when Katie was in bed with them and that she had never witnessed Gore touching Katie improperly.  The State objected under Mississippi Rule of Evidence 608(b)[19] and to Stanley "testifying to a collateral event." The circuit court permitted Gore to proffer Stanley's testimony.  Following the proffer, the circuit court concluded that Stanley's testimony was "prohibited under 608(b). . . . [F]urthermore, the only [major] point of divergence is the fact that the three of them, according to this witness's testimony, were never naked in the bed together, and all that's extrinsic . . . ."

---

[18]*See supra* ¶ 14.

[19]Mississippi Rule of Evidence 608(b) provides, in pertinent part, that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence."  Miss. R. Evid. 608(b).

¶23. The circuit court erred in concluding that Stanley's testimony was prohibited under Rule 608(b). The State concedes as much. The Comment to Rule 608(b) provides:

> [s]ubsection (b) flatly prohibits impeaching a witness's character for truthfulness via extrinsic proof of specific acts of the witness's conduct, except criminal convictions pursuant to Rule 609.
>
> . . .
>
> This absolute prohibition on extrinsic evidence applies only when the sole reason for proffering that evidence is to attack or support the witness's character for truthfulness. The admissibility of extrinsic evidence offered for other grounds of impeachment, such as contradiction, prior inconsistent statement, bias, and mental or sensory capacity, is governed by Rules 402, 403, and 616.

Miss. R. Evid. 608(b) cmt. *See also* 28 C. Wright & V. Gold, *Federal Practice and Procedure* §§ 6117-6120 (1993) (providing general discussion of Federal Rule of Civil Procedure 608(b)). Stanley's testimony pertained not to Katie's character and conduct, but rather to specific acts of Gore's conduct. Moreover, the "sole reason" for Gore proffering such evidence was not "to attack or support the witness's character for truthfulness." Miss. R. Evid. 608(b) cmt. Stanley's testimony provided a contrasting statement regarding a fact presented by the State through Katie's testimony (i.e., that all three were naked in bed).

¶24. Stanley's excluded testimony could provide *only* that she had witnessed no sexual abuse when she was awake and that she, Gore, and Katie were never naked in bed together while she was awake. But such testimony does not impeach or rebut Katie's testimony that she was molested by Defendant Gore while Stanley was asleep. Thus, this Court concludes that the circuit court's error was harmless in light of the limited value of Stanley's proffered testimony, when compared to the overwhelming evidence of Gore's guilt. *See **Jackson v.***

*State*, 645 So. 2d 921, 924 (Miss. 1994) (quoting *Newsom v. State*, 629 So. 2d 611, 612 (Miss. 1993)) ("[w]e are not required to reverse a case based solely upon the showing of an error in evidentiary ruling."). The jury was presented with overwhelming evidence of Gore's guilt, *see infra* Issue IV. The erroneous exclusion of this evidence is insufficient to warrant reversal.

### III. Whether the warrantless seizure of evidence from Gore's home was illegal.

¶25. "In reviewing the denial of a motion to suppress, we must determine whether the trial court's findings, considering the totality of the circumstances, are supported by substantial credible evidence. Where supported by substantial credible evidence, this Court shall not disturb those findings." *Moore v. State*, 933 So. 2d 910, 914 (Miss. 2006) (citations omitted).

¶26. Gore argues that "since the seizure of the vibrator in the present case was made neither incident to arrest and without consent, and without probable cause, it should have been suppressed." The State responds that:

> after waiving his rights, Gore voluntarily spoke with the officers, and offered to retrieve the vibrator that he claimed M.G. found and used on herself. There was no full-blown search conducted by the officers, and to the extent the situation could be characterized as a search, it was consensual. Accordingly, the trial court correctly denied Gore's motion to suppress.

¶27. "The United States Constitution and the Mississippi State Constitution guarantee citizens the right to be secure in their persons, houses, and possessions against unreasonable and warrantless searches and seizures." *Moore*, 933 So. 2d at 916 (citing U.S. Const. amend. IV; Miss. Const. art. 3, § 23). But "[v]oluntary consent eliminates the warrant requirement."

17

*Id*. (citing *Morris v. State*, 777 So. 2d 16, 26 (Miss. 2000)). "[W]here consent is given, the State is not required to demonstrate knowledge; rather, 'the burden [is] on the defendant to show impaired consent or some diminished capacity.'" *Id*. (quoting *Jones v. State*, 607 So. 2d 23, 29 (Miss. 1991)). Voluntary consent "is a question of fact to be determined by the total circumstances." *Id*. (quoting *Jones*, 607 So. 2d at 27).

¶28. At trial, the State moved to introduce the vibrator into evidence, and Gore objected, contending that he did not consent to the search of his residence by Deputy Head and Investigator Tucker. With the jury out, the circuit court examined Deputy Head. Deputy Head testified that, during questioning in the early morning hours of May 12, 2007, Gore had discussed the vibrator and then had "said he would get it. And I said, show me, because I was worried [there] may be a gun in the house, so he directed us straight to the bedroom, and that's where we pulled the box out from under the bed." The circuit court then overruled Gore's objection.

¶29. This Court concludes that the circuit court's denial of Gore's motion to suppress was "supported by substantial evidence . . . ." *Moore*, 933 So. 2d at 914. The circuit court was presented with evidence that Gore was informed of his *Miranda* rights, that he stated that he understood those rights as a former law enforcement officer, and that he then proceeded to recount his version of the incident to the officers on his front porch. In so doing, Gore noted that the vibrator was under his bed and offered to retrieve it. Concerned that Gore may have had a weapon in the house, Deputy Head requested that Gore lead him to the vibrator. *See Norman v. State*, 302 So. 2d 254, 257-58 (Miss. 1974) ("items may be seized as a result of a cursory viewing of the area for persons or weapons which might present a security risk to

18

the officers."); ***Terry v. Ohio***, 392 U.S. 1, 27, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1967) ("there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer . . . ."). Gore then voluntarily led the officers to his bedroom, where the vibrator was retrieved. Under these circumstances, Gore failed to rebut the evidence presented that he gave consent and further failed to satisfy his burden of proving "impaired consent or some diminished capacity." ***Moore***, 933 So. 2d at 916. Accordingly, this issue is without merit.

**IV. Whether the evidence was sufficient to support the jury verdict.**

¶30. Regarding sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ***Bush v. State***, 895 So. 2d 836, 843 (Miss. 2005) (quoting ***Jackson v. Virginia***, 443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).

¶31. As to the disputed elements under Mississippi Code Section 97-5-23(1), the State had to prove that Gore "handle[d], touch[ed] or rub[bed] with hands or any part of his . . . body or any member thereof," M.G., "for the purpose of gratifying his . . . lust, or indulging his . . . depraved licentious sexual desires . . . ." Miss. Code Ann. § 97-5-23(1) (Rev. 2006). This Court concludes that the jury was presented with not merely sufficient evidence of Gore's guilt on the enumerated elements (i.e., a rational juror could have found each element beyond a reasonable doubt), but overwhelming evidence of such.

¶32. Daniel's testimony about the "spooning" incident, wherein Gore was "behind" and "on" M.G. "with his pants around his ankles" just weeks prior to the subject incident, along

19

with Gore's insistence on babysitting M.G. on May 11, 2007; the condition in which Bohn found M.G. with Gore that evening ("completely naked" and in bed with him); the unexplained enlargement of M.G.'s anus while she was in Gore's exclusive control; M.G.'s own statements ("*Papa, owee's butt*"); Gore's excuses for M.G.'s enlarged anus when confronted by Bohn, *before* she even mentioned that M.G.'s anus was enlarged; Gore's multiple, inconsistent stories regarding the toddler's condition; and Dr. Williams's expert opinion that M.G. had been sexually abused, collectively satisfy the requisite elements for "gratification of lust" outlined in Mississippi Code Section 97-5-23(1). Accordingly, this issue is without merit.

## CONCLUSION

¶33.  Based upon the aforementioned analysis, this Court affirms Gore's conviction and the sentence imposed by the Circuit Court of Rankin County.

¶34.  **CONVICTION OF GRATIFICATION OF LUST AND SENTENCE OF FIFTEEN (15) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH CONDITIONS, AFFIRMED**.

**WALLER, C.J., CARLSON AND GRAVES, P.JJ., DICKINSON, LAMAR, CHANDLER AND PIERCE, JJ., CONCUR. KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

**KITCHENS, JUSTICE, DISSENTING:**

¶35.  This Court historically has deemed evidence of a defendant's prior sexual misconduct with a person other than the victim of the alleged crime for which the defendant was charged more prejudicial than probative under Mississippi Rules of Evidence 403 and 404(b) and has found such evidence *per se* inadmissible at trial. *Lambert v. State*, 724 So. 2d 392, 394 (Miss. 1998), *overruled by Derouen v. State*, 994 So. 2d 748, 756 (Miss. 2008); *Mitchell v.*

20

***State***, 539 So. 2d 1366, 1372 (Miss. 1989), *overruled by **Derouen***, 994 So. 2d at 756. We have said that allowing evidence of a defendant's prior sexual misconduct "would not be consistent with the purposes of M.R.E. 404(b), nor consistent with the notion that a defendant is on trial for a specific crime and not for generally being a bad person." ***Mitchell***, 539 So. 2d at 1372, *overruled by **Derouen***, 994 So. 2d at 756.[20] However, in ***Derouen v. State***, this reasoning was overruled by our holding that "evidence of a sexual offense, other than the one charged, which involves a victim other than the victim of the charged offense for which the accused is on trial[,]" *is admissible* if it is "properly admitted under Rule 404(b), filtered through Rule 403, and accompanied by an appropriately-drafted limiting or cautionary instruction." ***Derouen v. State***, 994 So. 2d 748, 756 (Miss. 2008). Post-***Derouen***, evidence of a defendant's prior sexual misconduct with a person other than the victim of the misconduct for which the defendant was indicted is admissible the same as any other prior-bad-act evidence; it is admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," unless the "probative value is substantially outweighed by the danger of unfair prejudice." M.R.E. 404(b), 403.

¶36.    Although this Court has not ruled on whether nudist practices or temporally remote allegations of child molestation fall within the purview of Rules 403 and 404(b), it is clear that such evidence does not fall squarely into a Rule 404(b) exception of "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or

---

[20] "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." M.R.E. 404(b).

21

accident." Yet, as the majority suggests, some jurisdictions are willing to allow prior-bad-act

evidence related to child-molestation allegations, and some federal courts also are admitting

such evidence, given that the Federal Rules of Evidence have been modified to allow prior

bad acts in cases where child molestation is alleged.[21]

¶37.    As can be seen by *Derouen* and the majority opinion in this case, Mississippi is

migrating in the same direction.  In fact, in *Derouen*, 994 So. 2d at 756, this Court suggested

that our rules committee put forth a rule similar to those adopted by the federal courts, which

would make admissible prior-bad-act testimony similar to that presented in the case before

us; however, no such rules change has been made.  Thus, the general rule, along with the

exceptions outlined in Rule 404(b), that prior bad acts not resulting in a conviction are not

admissible as part of the State's case-in-chief, still applies in Mississippi's state courts.

Moreover, although the *Derouen* Court held that evidence of sexual misconduct with persons

other than the alleged victim of the crime with which the defendant is charged is not *per se*

---

[21] Federal Rule of Evidence 413(a) provides:

> In a criminal case in which the defendant is accused of an offense of sexual assault, evidence of the defendant's commission of another offense or offenses of sexual assault is admissible, and may be considered for its bearing on any matter to which it is relevant.

F.R.E. 413(a).  Federal Rule of Evidence 414(a) provides:

> In a criminal case in which the defendant is accused of an offense of child molestation, evidence of the defendant's commission of another offense or offenses of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant.

F.R.E. 414(a).

inadmissible, the Court has yet to provide a workable test for the admissibility of such evidence.

¶38.    ***Foburg v. Florida*** illuminates the need for a workable test. ***Foburg v. Florida***, 744 So. 2d 1175 (Fla. App. 2 Dist. 1999).  There, Foburg was convicted of fondling a child under the age of sixteen and encouraging the delinquency of a minor. ***Id***. at 1176.  The District Court of Appeal of the Second District of Florida was asked to determine whether evidence of Foburg's prior bad acts should have been presented to the jury. ***Id***.   At trial, the prosecution called three prior-bad-acts witnesses who claimed that Foburg had offered them alcohol and cigarettes seventeen years prior to trial, when they were minors. ***Id.*** at 1177.  One of the witnesses testified that Foburg "hugged her a little too closely," and the other two girls testified that they had seen sexually explicit material at Foburg's residence. ***Id***.  In applying Florida Statutes Section 90.404(2)(a), which is quite similar to our Rule 404(b), the ***Foburg*** Court noted that, beyond the requirement that the evidence be relevant, the charged and collateral offenses must be "strikingly similar" and must "share some unique characteristic or combination of characteristics which sets them apart from other offenses."[22] ***Id.***  The Court ultimately held that, because of the dissimilarities in the charged offense and the prior bad acts, and because the prior-bad-act evidence "was not uniquely factually characteristic of the charged offenses," it was reversible error to admit the evidence. ***Id***. at 1178-79.   The court

___

[22] In Florida, "similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity." Fla. Stat. § 90.404(2)(a) (1995).

went on to say that "the only purpose served by the State's introduction of the [prior-bad-acts] evidence was to imply that, because Foburg had committed similar acts seventeen to twenty years ago, he must have committed the acts with which he [had been] charged." *Id*. at 1178.

¶39.    In another case similar to this one, ***Hoffman v. State***, 576 S.E.2d 102 (Ga. App. 2003), Hoffman was convicted of child molestation after allegedly getting into bed with the thirteen-year-old daughter of a friend he had met at a nudist colony. *Id*. at 104.   At trial, the prosecution elicited prior-bad-act evidence that, during one visit to a nudist colony, Hoffman had grabbed a naked eleven-year-old girl in a hot tub and had "restrained" the girl in his lap as she had attempted to free herself from his grasp. *Id*. at 106.   On review, the Court of Appeals of Georgia noted that prior-bad-act evidence is admissible as long as it goes to show "identity, plan, scheme, state of mind [or] course of conduct." *Id* at 104.   The court went on to say, however, that before prior-bad-act evidence is admissible, the State must show that, among other things, "there is sufficient similarity between the independent offense and the crime charged so that proof of the former tends to prove the latter." *Id.* at 104-05 (citing ***Turner v. State***, 538 S.E.2d 125 (Ga. App. 2000)).   The Court of Appeals of Georgia came to the conclusion that, because the evidence of Hoffman's conduct in the hot tub was "sufficiently similar" to the conduct for which Hoffman was convicted, the prior-bad-act testimony was admissible. *Id*. at 106.

¶40.    Both of these cases stand for the proposition that a bright-line rule on the issue at hand simply is not feasible; however, it is clear that a ***Derouen***-esque rule must be accompanied

24

by some reasonable guidelines, including the necessity that there be some nexus or striking similarity between the prior bad acts and the acts for which the defendant is charged.

¶41. Here, a nexus between Gore's naturistic proclivities and the act of molesting a twenty-one-month-old infant was not proven. No evidence was adduced to show a connection between his having practiced nudism and his being a child molester. Thus, proof of Gore's alleged nudist activities was irrelevant, and the trial judge abused his discretion in ruling that this evidence went to prove Gore's plan, preparation, or intent to commit the charged offense. While a nexus between Gore's alleged molestation of his daughter, Katie, and his alleged molestation of M.G. provides somewhat greater potential for admissibility than the former, the similarities among the several incidents are few. Although both of the alleged victims are female, the ages of the girls are greatly dissimilar. Katie was twelve years old at the time of her alleged molestation, and M.G. was less than two. Moreover, the seven years between Katie's alleged molestation and M.G.'s alleged molestation make the two events temporally remote.

¶42. Although the trial court did allow the evidence under Rule 404(b), filtered it through Rule 403, and issued a limiting instruction as ***Derouen*** requires, the incidents the State was allowed to bring before the jury fail to prove that Gore was planning, preparing, or intending to molest M.G. Instead, it is clear that the State offered this evidence for the sole purpose of establishing that, because Gore allegedly had engaged in these prior acts, he had the propensity to molest M.G. The majority admits as much in suggesting that, because Gore allegedly had the motive to molest his daughter sexually or engage in nudist activities, he was led or tempted to commit the crime charged. Maj. Op. at ¶20.

25

¶43.    Given that Mississippi Rule of Evidence 404(b) plainly prohibits the introduction of a person's prior bad acts "in order to show that he acted in conformity therewith[,]" the trial court abused its discretion in allowing the State to present evidence that Gore was a nudist and that Gore allegedly had sexually molested twelve-year-old Katie nine years prior to trial. M.R.E. 404(b).  In the context of this trial, such testimony was too prejudicial to have been tempered effectively by the trial court's limiting instruction.  This matter should be remanded for a new trial.